Morris **GROSSNER** et al., individually and on behalf of those similarly situated, Plaintiffs,

v.

**The TRUSTEES OF COLUMBIA UNIVERSITY IN the CITY OF NEW YORK**, et al., individually and in their official capacities, Defendants.

No. 68 Civ. 1877.

United States District Court
S. D. New York.

July 9, 1968.

the City of N. Y., Grayson, Kirk, David B. Truman, and William E. Petersen.

J. Lee Rankin, Corp. Counsel of the City of New York, New York City, for defendant, Howard Leary.

Frank S. Hogan, New York City, pro se.

## OPINION

FRANKEL, District Judge.

In this lawsuit, which grows out of grave troubles recently experienced at Columbia University, nine assorted plaintiffs—five students, the pastor of a church near the University, a chapter president of the Congress of Racial Equality, an alumnus, and a lecturer in the College and Graduate Faculties [1]—assert for "themselves and all persons similarly situated" various "causes of action" and demands for injunctive relief. They have moved for an injunction *pendente lite*. The application for such extraordinary relief is without merit, and will be denied. A cross-motion for summary judgment will be held in abeyance.

## I.

The plaintiffs complain broadly that they and members of their "classes" have for some time been protesting against the "policy-making structure of the University," the President's "unlimited and undefined" disciplinary powers, the planned construction of a University gymnasium in a public recreational area, and the University's involvement in the "Institute for Defense Analysis [*sic*] * * *, a consortium of twelve American universities conduction [*sic*] research for the Department of Defense." Before April 23, 1968, it is alleged, plaintiffs attempted to communicate such protests "to the appropriate officials of the University without any serious consideration or response thereto being given." Complaint, par. 14. Moreover, they charge, on September 25, 1967, defendant Kirk,

Lubell & Lubell, William M. Kunstler, Arthur Kinoy, Floyd McKissick, New York City, Morton Stavis, Newark, N. J., Mary Kaufman, New York City, Michael A. Reiter, Madison, Wis., Dennis J. Roberts, Harriet Van Tassel, George Logan, Newark, N. J., Frederick H. Cohn, William H. Schaap, Charles T. McKinney, New York City, John E. Silverberg, New York City, for plaintiffs.

Thacher, Proffitt, Prizer, Crawley & Wood, New York City, for defendants, The Trustees of Columbia University in

1. When the action was begun, there were eleven plaintiffs. Two, a student and a professor, announced their withdrawal be-

fore the motions here in question were filed.

the University President, "issued an edict prohibiting further protest demonstrations within the buildings of the University, no matter how peaceful or nonviolent." Ibid. On April 23, plaintiffs and others assembled and went to the offices of the President in Low Memorial Library. When they learned that the President was refusing to meet with them, they proceeded to the site of the disputed gymnasium, but they were soon dispersed by the police. The plaintiffs then "returned to the campus to begin a peaceful demonstration in Hamilton Hall to protest the refusals of the University to give reasonable consideration to the structural and policy changes hereinabove referred to." Id., par. 15. "In addition to the said demonstration in Hamilton Hall, from April 23 to April 30, 1968, plaintiffs, in their attempt to bring about a discussion and negotiations of the said structural and policy changes with the appropriate University officials, assembled" in three other University buildings and in "the offices of the defendant KIRK, where they remained until their arrests on the latter date * * *." Id., par. 16.

In other words, as the complaint goes on to say, the plaintiffs and others for whom they purport to speak occupied by "sit-ins" four of the school's buildings and the President's office uninterruptedly for a week until they were forcibly removed. Ibid.

Notwithstanding that their occupation of the buildings was "peaceful and orderly," plaintiffs charge, defendant President called in the police, who, at about two a. m. on April 30, 1968, "without any provocation by plaintiffs and members of their classes, * * * utilizing excessive and unnecessary force and in a brutal and inhuman manner physically assaulted and beat plaintiffs and the members of their classes and arrested more than 700 thereof." Then, it is asserted "upon information and belief," various charges of criminal trespass, resisting arrest, disorderly conduct, loitering, inciting to riot, and possession of weapons and dangerous instruments and appliances were filed against those so arrested.

The complaint goes on to allege that defendant University officials have brought or are threatening disciplinary proceedings arising from the foregoing events under University statutes which are vague, devoid of standards, offensive to principles of due process, and contrary to the protections of the First and Fourteenth Amendments. The threats of discipline "and/or arrest" are allegedly "being made * * * in bad faith without any hope of ultimate success and with the basic purpose and effect of intimidating and harassing * * * and punishing [plaintiffs] for, and deterring them from," exercising their First Amendment rights.

In order to avoid the "chilling effect" of such action by defendants, plaintiffs' first "cause of action" is to enjoin the University disciplinary proceedings and declare void a general statute of the University announcing its disciplinary powers.

In their second "cause of action" plaintiffs charge that the 700-odd people arrested on the morning of April 30 committed no illegal acts; that they are facing criminal charges only because they "resisted an unprecedented invasion of their University * * * and an uncontrolled exercise of violence" by the police; that the criminal charges against them are designed only to "chill" First Amendment freedoms; and that the pending prosecutions should be enjoined.

A third "cause of action" adds that defendant Hogan is both District Attorney of New York County, in charge of the pending prosecutions, and a Trustee of the University. These dual roles, plaintiffs allege, will deny them equal protection and due process if the criminal proceedings are not enjoined.

In their fourth "cause of action," plaintiffs reiterate the charges of police brutality on the morning of April 30; predict that such official violence "may" recur as a response to further acts of peaceful protest; and ask that the police

be enjoined from perpetrating further assaults of a similar nature.

A fifth "cause of action" says the campus was "taken over" by the police upon the invitation of defendant Kirk; that this was "in violation of the fundamental integrity of the University community and without regard for appropriate institutions of self-government, including the faculty and student body" (par. 41); that plaintiffs, "in seeking to protect the integrity of the institutions of the University from invasion by the police, are invoking not only the ancient and historic regard for the integrity of the academic community but as well their rights" of free speech and due process (par. 42); and that defendant Kirk should be enjoined or he "may again resort to a violation of the integrity of the academic community by surrendering control of the University to the police."

The sixth and final "cause of action" charges that the University structure, "essentially unchanged since 1754, affords no participatory power in the faculty or student body in the determination of policies and programs of the University." Par. 45. Plaintiffs say this "structure" violates unspecified "constitutional rights of faculty and students as well as the rights of members of the community affected by the actions of the University, in that it provides for a self-perpetuating body" of irresponsible trustees, "all in violation of the fundamental tenets of a democratic society as outlined in the Constitution of the United States." The court is asked to order a restructuring of the University under a "program to be submitted to this Court for its approval."

## II.

The motion papers seeking a preliminary injunction contain no affidavit by any plaintiff or member of any of the alleged classes. Instead, supposedly to buttress the allegations of the complaint, the motion was initially rested upon the affidavit of counsel, whose asserted knowledge of relevant facts dates only from May 19, 1968 (after the filing of the complaint), and whose sworn statements consist largely of argumentation rather than supposed propositions of fact.[2] In a more technical age, or with more technical defendants, this sort of submission as a basis for an extraordinary kind of extraordinary relief might well have collapsed from its own infirmities. However, the parties and the court have dealt with the alleged merits of the motion in broader terms.

From the several affidavits on both sides, the undisputed facts and the unresolved disputes become sufficiently apparent for present purposes. It is clear that some hundreds of students and others conducted round-the-clock sit-ins occupying University buildings and the President's office for the week or so beginning April 23, and that they left on April 30 only because they were forcibly removed. At the outset of this "peaceful" protest, the Acting Dean of Columbia College was held captive in his office in Hamilton Hall for some 24 hours. During the occupancy of President Kirk's office, his files were rifled, documents were removed, and copies were made of correspondence, memoranda, diaries and other records. Since that time, copies of such records have been widely circulated on the campus and to public communications media.[3]

2. In his affidavit opposing the motion, defendant President Kirk tendered asserted grounds for the granting of summary judgment dismissing the complaint, a matter adverted to again hereafter. This evoked in reply an affidavit of plaintiff Thomas N. Rothschild, a law student, who does report knowledge of some of the earlier events, and enlarges upon such knowledge with general assertions about facts which do not appear to have been

(or, at least, are not shown, and are most unlikely, to have been) within his personal ken. See notes 3, 4 and 10, infra.

3. The plaintiff law student Rothschild's reply affidavit contains a somewhat pregnant negative in response to defendant Kirk's assertions about the rifling of his files. Without intimating that he was there (and his affidavit asserts facts

It is undisputed, despite some equivocal legalisms for plaintiffs, that those participating in the sit-ins denied access to the buildings to faculty members, students and University personnel, among others.[4] Through the week of sit-ins, faculty members and others sought to persuade the occupants to leave peaceably. When these negotiations failed, the police moved in on the night of April 29–30 to force the departures and make the arrests which are central in plaintiffs' complaint.[5] Plaintiff Morris Grossner was among those arrested on that night.

As part of his efforts to cope with the disturbances in the University community, defendant Kirk proceeded shortly after April 30 to appoint a Joint Committee on Disciplinary Affairs comprised of faculty members, students, and administrators. On May 9, 1968, this Committee recommended disciplinary measures and general procedures "predicated on the assumption that trespass charges will be dropped." [6] In this initial expression of its views, the Committee observed that the "demonstrations" beginning April 23 had "involved a number of unprecedented offenses against the University community;" that buildings had been entered and occupied illegally; that students, faculty and others had been excluded from their classrooms and offices; that University and personal property had been damaged; and that acts of such kinds, if committed by a single person or group "in an ordinary atmosphere," would deserve "maximum

covering several places during the same period, so that, whether he was in any of them, he could not have been in all of them), Rothschild swears: "At no time did those students, assembled in defendant Kirk's office as part of a non-violent protest, rifle any files or otherwise steal papers or documents belonging to any of the defendants." Affidavit pp. 2–3. For present purposes, apart from the somewhat dubious character of this denial, it is not important how the supposedly disputed facts might be found. It is enough that the disciplinary proceedings, which plaintiffs claim a right to block altogether until the criminal charges have been tried, are concerned, *inter alia*, with substantial charges of this kind. Furthermore, nobody denies that records from President Kirk's files have been duplicated and given wide public distribution by people unauthorized to have them.

4. The reply affiant, plaintiff Rothschild, "from his own personal observation of the events of April 23–30, 1968, and on the basis of interviews with persons involved, denies that access was at any time denied to other students, members of the faculty, or administrators, *except insofar as those persons threatened, upon entry into the buildings, to illegally and forcefully expel the protesters from the buildings, and disrupt and destroy their non-violent sit-in, activity which is protected under the First and Fourteenth Amendments to the Constitution.*" Affidavit, p. 3 (emphasis added). This sort of "denial" scarcely furthers plaintiffs' theory that they are entitled to thwart the University's efforts to find out what happened and impose discipline upon students who may (or may not) have done the things Rothschild disputes in quasi-legal terms. Even more patently inapposite is his denial that the protesters made capitulation to their demands a condition for voluntarily ending the sit-ins. Rather, he says, "it was the intransigence of the defendants, and their refusal to meet with the representatives of the protesting students or even to negotiate with them in good faith through members of the faculty or other intermediaries, which caused the continuation and intensification of the protests on the part of the students." Ibid. What emerges is the undisputed fact that the "protestors" stayed in the buildings and refused to get out unless the University officials did things which may or may not have been good things to do, but were not in any event legally required as conditions to terminating the seizures.

5. University officials urged and insisted that this police operation be conducted with maximum order and minimum force. How closely that objective was approached cannot be known from the papers and is not a question requiring even tentative resolution for purposes of the motion now before the court.

6. The Committee's recommendations of May 9, and supplemental formulations of May 13, 1968, are attached as exhibits to the reply affidavit of plaintiff Rothschild.

punishment." However, the Committee said, the atmosphere had not been "ordinary;" many of the demonstrators had "acted out of deep commitment, not personal animus, convinced that the University was not responsive to legitimate demands;" and there was a possible measure of shared responsibility to be assessed by a recently created fact-finding body. Recognizing that there might be mitigating factors, the Committee nevertheless concluded:

"It is clear, in any case, that no apportionment of responsibility can justify these violations of established rules, whether explicit regulations of the University or the unwritten rules of behavior that govern any community. The actions of the demonstrators were wholly out of proportion to their declared grievances."

Finding that the demonstrators shared "a common responsibility for [the] * * chief consequences" of the demonstrations, the Committee recommended that there be "a uniform discipline * * * for the act of participation as such"— namely "disciplinary probation through June 30, 1969." Elaborating on this proposal, the Committee observed that such probation should serve mainly as "a clear warning to the offender" of "more severe penalties" for future infractions, but should not entail loss of "financial aid, or comparable hardship," or denial "of the right to participate in political activities in the University."

While proposing such limited and uniform punishment "for the act of participation as such," the Committee went on to say that "the University should investigate every charge of malicious action such as wilful injury to persons, theft, deliberate damage to property, or invasion of private papers, and should bring appropriate charges against the individual offenders."

In broad outline, the Committee described as follows the procedural framework for implementing its substantive judgments:

"In the light of these intitial conclusions, the Dean of each School or Faculty should determine which students in that School or Faculty were involved in the demonstrations and, following discussions with those students, should impose the discipline recommended above. *A student who fails to appear before the Dean should be suspended.* If the student believes that the penalty imposed upon him by the Dean is excessive in view of that recommendation, he may appeal directly to the Joint Committee on Disciplinary Affairs.

"If a student denies the Dean's charge of participation, the Dean should invoke procedures of the kind outlined hereafter. If the Dean concludes that more serious penalties are appropriate, because the student was already on probation or because he charges the student with offenses additional to participation in the demonstrations, the Dean should proceed · against the student in this same formal manner." (Emphasis added.)

The Committee went on then to prescribe detailed procedures—notice by the dean in writing; the convening of disciplinary tribunals, each to be comprised of two faculty members, two students, and an administrator selected by the dean (from persons not 'normally concerned with discipline); and the right of students before the tribunals "to be advised by counsel * * * and to present evidence" ("but counsel should not participate in the proceedings"). Further, the Committee said, students should not be required to give evidence against themselves; a transcript should be made; the proceedings should be public unless the tribunal "rules that the spectators are disrupting the proceedings;" students should be presumed to be innocent "until their guilt has been clearly proven in the proceeding;" and conduct must be judged only by "public or University statutes, rules, or regulations" to be "clearly identified" as the grounds of the alleged violations. The Joint Committee went on to prescribe a right of appeal, and undertook to serve as an appellate tribunal. Provision was made for fur-

ther review by the President, with the stipulation that he was not to increase any penalty "sustained or imposed by the Joint Committee."

After defendant President and the Trustees had responded to its pronouncements of May 9, the Joint Committee issued a further statement on May 13. It recalled its earlier premise that the trespass charges would be dropped; noted that this was not being done; observed, however, that it was "now prepared to exercise its appellate jurisdiction;" and suggested that the Deans "begin to implement its recommendations concerning intramural discipline, but that application of all penalties be held in abeyance, pending action in the courts." Further, it said:

> "The Joint Committee will entertain an appeal from a penalty applied before the final disposition of trespass charges against a student, even if that penalty is otherwise consistent with the Joint Committee's recommendations."

Appellate and other procedures were prescribed in fuller detail. And, finally, the Committee concluded with this reminder:

> "* * * A student who fails to appear before the Dean is liable to immediate suspension, even though a trespass charge is still pending against him."

Acting along the lines formulated by the Joint Committee, the deans of the several schools proceeded within a few days to send letters to students charged with participation in the demonstrations of April 23–30. In each case, the student addressee was invited as the first step to appear for a meeting with the dean no later than a specified date. A warning was given that failure to make such an appearance would result in sus-

pension. The initial meeting with the dean was to serve in essence as the "pleading" stage of the proceeding. The student summoned was given three choices: to admit the charge, deny it, or say nothing. An admission of the participation charged would lead to the disciplinary probation recommended by the Joint Committee. If the student denied the charge or stood mute, his case would be referred for hearing before a five-member tribunal of the type the Joint Committee had recommended.

The plaintiff Grossner and three other students (Rudd, Freudenberg, and Hyman, who are described as "plaintiffs" in plaintiffs' papers, but are not named as such and have nowhere said they want to be plaintiffs[7]) received letters of the foregoing type from their Dean, Alexander Platt. These letters, mailed on May 16, 1968, informed the addressees that they were to meet with the Dean not later than May 21, or face suspension.

On the following night, May 17, Rudd led a group of demonstrators conducting a sit-in at a University-owned apartment building on West 114th Street. The group was ordered to leave, but refused to do so. The police were called; the demonstrators were ousted; and Rudd was arrested and charged with criminal trespass. It is this arrest and criminal charge on May 17, after the Dean's notice relating to events of April 23–30, which are said by plaintiffs to be a crucial constitutional obstacle to the University's taking even the initial step of its disciplinary procedure. As to the students Freudenberg and Hyman, while the attorney's affidavit says that they (like Rudd) "have criminal charges pending against them" on Columbia's complaint, no date is given for such charges or for the events to which they relate.[8]

In any event, the four named students made clear that they would not—and

---

7. On oral argument of the pending motion, one of plaintiffs' counsel acknowledged that this discrepancy is at least unaesthetic.

8. Plaintiffs did not supply the pertinent date for Rudd either. It is mentioned

by defendant Kirk, however, and seems to be undisputed. This defendant also reports that plaintiff Grossner was arrested during the police activities on the night of April 29–30.

they did not—comply with Dean Platt's notice of a meeting with him. Instead, they declared through counsel that the Dean was acting illegally, and proceeded to occupy a University building again in another sit-in. On May 20, counsel for these students sent a telegram to Dean Platt reading in pertinent part as follows:

"The undersigned are attorneys for John Doe, in the criminal case brought upon complaint of Columbia University. John Doe has informed us that Columbia University has started disciplinary proceedings against him arising out of the same general set of facts and has threatened that failure to appear before you on May —, 1968 will result in suspension.

"Appearance before you as a representative of the same University that has brought the criminal charges against him would: 1) make a nullity of John Doe's constitutional rights and protections; 2) make Columbia University prosecutor in one instance and judge in another; 3) be contrary to common practice of staying administrative hearings pending disposition of criminal charges, and 4) be contrary to recognized concepts of fair play and justice.

"In addition, while you refer to the Joint Committee's recommendation at no time have you informed our client that the trespass charge against him will be dropped, which you know is the assumption upon which the Committee's recommendations are based.

"For those reasons and at this time John Doe declines to testify before you at the time set forth in your letter."

At five p. m. on the following day, May 21, the last day for the appearances called for by the Dean's letters, the attorneys who had sent the quoted telegram met in person with the Dean and repeated orally what the telegram had said. Dean Platt stated that the students were required to appear in person; that the appearance of lawyers *instead* of them was not acceptable; and that failure to appear, as the letters warned, would lead to suspension.[9] Plaintiff Grossner and the others persevered in their refusals and were suspended for this.

In the meantime, while counsel were explaining on May 21 to Dean Platt why the procedures formulated by the Joint Committee could be blocked and ignored in their inception, the four named students and others were demonstrating on the campus, publicizing their activity in handbills as a "Discipline the Deans Rally." This activity began outdoors. Then Rudd and others proceeded once more to Hamilton Hall to conduct another sit-in. Demands and requests that they depart voluntarily were unavailing. In the night of May 21–22, the police were called again, the occupants were ousted, and arrests were made of 75 University students, a few former students, some Barnard and Teachers College students, and 38 outsiders unaffiliated with the University.

When that night was over, it was found that a professor's irreplaceable research papers, representing years of work, had been removed from his Hamilton Hall office and burned in a nearby room.[10]

---

9. The papers are a little ambiguous, here as elsewhere, and there was a time during oral argument when the ambiguity threatened to spread. There was some intimation of a possible claim that the disciplinary procedure was faulty because it sought to compel appearances by the students before their deans *without counsel*. This was ultimately clarified, however, and it was acknowledged that the students in question unequivocally refused to appear in person on any terms, with or without counsel.

10. Plaintiff Rothschild finds it appropriate to assert in his affidavit "on information and belief that it was not persons supporting or sympathizing with the student protests who were responsible for the destruction of the papers of Professor Ranum, or for the fires or other acts of vandalism on the night of May 21–22, 1968, an allegation also denied publicly by various members of the Strike Coordinating Committee." Similarly, his affidavit goes on to say: "It is a matter of public record that numerous undercover

The parties go on to describe other acts of violence and destruction, with disputes about the details and the blame, but it seems unnecessary for present purposes to pursue further the sorrowful accounts. Enough has been recounted to give the setting in which plaintiffs now move for a preliminary injunction, the sweep of which is best described in their own terms. The prayer of the motion is:

"1. For a preliminary injunction enjoining and restraining the defendants from taking any disciplinary action and from instituting disciplinary proceedings, including but not limited to expulsion, probation, and the making of any notation in any school records of the names or other identifying symbols of plaintiffs and members of their classes pursuant to Section 352 of Chapter XXXV of the Statutes of Columbia University, or pursuant to any other University rule, regulation, or procedure, or pursuant to the recommendations of the Joint Committee on Disciplinary Affairs, against plaintiffs and members of their classes, for their alleged activities on the Columbia Campus set forth in plaintiffs' complaint, on the grounds that such disciplinary action and/or hearings constitute a violation of plaintiffs' First, Fifth and Fourteenth Amendment rights under the United States Constitution;

"2. For a preliminary mandatory injunction ordering and requiring defendants to immediately revoke the suspension of and to reinstate Morris Grossner, Mark Rudd, Nicholas Freudenberg and Edward Hyman as students in good standing at Columbia University;

"Such injunctions to run until such time that all criminal cases now pending in the Courts of the State of New York against plaintiffs and members of their classes are disposed or [sic] or until further order of this Court * * *."

## III.

Our highest Court has made clear in the labors of a long generation that the First Amendment's mandate protecting free expression "must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow." Bridges v. State of California, 314 U.S. 252, 263, 62 S.Ct. 190, 194, 86 L.Ed. 192 (1941). The Court has insisted steadily on the "principle that debate on public issues should be uninhibited, robust, and wide-open * * *." New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). It has also made clear, however, the gross error of believing that every kind of conduct (however non-verbal and physically destructive or obstructive) must be treated simply as protected "speech" because those engaged in it intend to express some view or position. E. g., United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498, 69 S.Ct. 684, 93 L.Ed. 834 (1949); cf. People v. Stover, 12 N.Y.2d 462, 240 N.Y.S.2d 734, 191 N.E.2d 272, appeal dismissed, 375 U.S. 42, 84 S.Ct. 147, 11 L.Ed.2d 107 (1963). Similarly, the Court has rejected the notion that "everyone with opinions or beliefs to express may do so at any time and at any place." Cox v. State of Louisiana, 379 U.S. 559, 574, 85 S.Ct. 476, 486, 13 L.Ed. 2d 487 (1965); Adderley v. State of Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L. Ed.2d 149 (1966). Without such inescapably necessary limits, the First Amendment would be a self-destroying license for "peaceful" "expression" by the seizure of streets, buildings and offices by mobs, large or small, driven by

agents, *agents provocateurs*, and various other persons opposed to the actions of the student protesters have nevertheless participated in the protests for the purpose of embarrassing and undermining them; the arrest of Rudd, a member of a class of plaintiffs, for instance, was effectuated by an undercover agent posing as a student striker."

motives (and toward objectives) that different viewers might deem "good or bad." Cox v. State of Louisiana, supra, 379 U.S. at 567, 85 S.Ct. 476. It is such a license plaintiffs claim when they state the basic premise of their lawsuit as follows:

> "Plaintiffs maintain, consistent with the American tradition of democratic and legal confrontation, that the non-violent occupation of five buildings of Columbia University for less than one week in the circumstances of this case is fully protected by the First Amendment guarantees of the right to petition government for the redress of grievances, * * * to assemble and to speak. Plaintiffs maintain that the non-violent occupation of the buildings was absolutely necessary to breathe life into the First Amendment principle that government institutions should reflect the will of the people and that this interest must prevail under any balancing test against the inconvenience to defendant Columbia University in having five of its buildings occupied by students for approximately one week." [11]

Embellishing such untenable propositions, plaintiffs (or, more fairly, the sixteen attorneys who sign their brief) proceed to argue that the rhetoric and the tactics of the American Revolution are the guides by which judges are to construe the First Amendment. The "rule of law," they explain, must not be overrated: "Had the Americans agreed that the rule of law, however despotic, must always prevail; had the Americans felt that dropping the tea in the harbor

was going too far; had the Americans not focused on fundamental principles, this country might still be a colony today."[12] The message, insofar as it is intelligible, possibly means that a tea party today, if nothing else could achieve repeal of a hated tax, would be protected by the First Amendment. Or possibly it means something else. Whatever it is meant to mean, and whatever virtues somebody might think such ideas might have in other forums, arguments like this are at best useless (at worst deeply pernicious) nonsense in courts of law. See Fortas, Concerning Dissent and Civil Disobedience 34 (1968); and see id. at 15, 18, 30, 46–7, 62–3.

It is surely non-sense of the most literal kind to argue that a court of law should subordinate the "rule of law" in favor of more "fundamental principles" of revolutionary action designed forcibly to oust governments, courts and all. But this self-contradictory sort of theory—all decked out in the forms of law with thick papers, strings of precedent, and the rest—is ultimately at the heart of plaintiffs' case. And so it is not surprising that plaintiffs' efforts to implement the theory have led them to champion a series of propositions of unsound constitutional law.

Specifically, the pending motion for a preliminary injunction is doomed, *first,* because it fails the threshold test of showing jurisdiction in this court to enjoin the University's disciplinary proceedings, and, *second,* because even if there were jurisdiction, there would be no basis on the merits for awarding such relief.

---

11. Memorandum of Law on behalf of Plaintiffs in Support of Motion for Preliminary Injunction, p. 24. The ellipsis reflects omission of a footnote where plaintiffs cite Hammond v. South Carolina State College, 272 F.Supp. 947 (D.S.C.1967), which held invalid a state college rule forbidding without limitation "any public demonstrations without prior approval of the College administration * * *." There is a world of difference between that case of "unfettered discretion" to

permit or forbid expression, Cox v. State of Louisiana, 379 U.S. 536, 558, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), and the rule here against demonstrations inside buildings.

12. Plaintiffs' Memorandum, p. 32. Also, at p. 34: "Rule by representative government or with the consent of the governed is more fundamental than the rule of law: that was fought out in the American Revolution."

## A. *Jurisdiction*

The complaint alleges federal jurisdiction under 28 U.S.C. § 1343(3) and (4) and 42 U.S.C. § 1983, which provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

While there are other statutes cited to sustain the court's jurisdiction, the quoted provision is sufficient to pose the vital issue as the parties have effectively formulated it—whether there is shown an alleged wrong "under color of" state law or, more familiarly, allegedly unlawful "state action," see United States v. Price, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966).[13]

█ As it affects all or most of the claims in the complaint, and all of the temporary injuctive relief sought on the pending motion, the question is whether the disputed actions or proceedings by Columbia University or its officials should be deemed to be "state action" in the pertinent sense. Plaintiffs recognize, of course, that the University is no part of state "government" in any general or formal sense. They urge, however, that it "is so impressed with a public interest as to render it amenable to the reach of the Fourteenth Amendment and therefore to the protection afforded by that Amendment to the rights guaranteed in the First and Fifth Amendments."[14] And they rely upon the now settled, but not always simply applied, principle that "private" conduct, normally outside the Fourteenth Amendment, may be controlled by that Amendment when "to some significant extent the State in any of its manifestations has been found to have become involved * * *." Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961); see also Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (4th Cir. 1963), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964).

To show state "involvement," plaintiffs point out that a large percentage of the University's income comes from public funds—some $49,500,000 in 1966 out of a total of $117,500,000 and, in 1967, about $59,700,000 of a total of $134,300,-

13. In the complaint, filed May 8, the motion papers, filed May 24 (including an affidavit of counsel, a long Memorandum of Law, and a separate document called "Points and Authorities"), and extended oral argument on June 18, 1968, plaintiffs relied expressly and exclusively upon the theory of "state action" or action "under color of" state law. This was shown not only in the words they used, but in the jurisdictional statutes (28 U.S.C. § 1343(3) and (4), 42 U.S.C. §§ 1981 and 1983) they cited. After argument the court called for further expressions from counsel on how the theory of "state action" might be affected by the fact that most of the governmental funds the University receives are federal rather than state (a matter touched briefly below). Responding to this inquiry, plaintiffs, on the evening of July 1, 1968, filed a remarkable 23-page document called "Supplemental Memorandum of Law on behalf of Plaintiffs on the Issue of State Action." In this they offer the following new views: (1) that the notion of "state action" is immaterial; (2) that this is a Thirteenth Amendment case because building a gymnasium on park land formerly used mainly or wholly by Negroes is a "badge of slavery" (presumably proposing in this way a new "cause of action" never yet pleaded); and (3) that the University proceedings complained of should be enjoined anyhow as unconstitutional "federal action," citing Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), and other suits against federal officers. It seems appropriate to limit the court's comments upon this Supplemental Memorandum. It has been read. It is not helpful.

14. Memorandum of Law, p. 5.

000.[15] The government monies, plaintiffs add, reflect in considerable measure the performance of research for, and the rendition of other forms of assistance to, the Federal Government, including agencies like Central Intelligence, Defense, and the Space Administration. There are, plaintiffs say, other forms of governmental "benefits" and "assistance" to the University, and they specify in this connection a lease by New York City of public land for construction of the controversial gymnasium. Finally, apart from specific research projects and similar activities, plaintiffs would have the court hold that the University is in the very nature of its functioning "so impregnated with a governmental character as to become subject to the constitutional limitations upon state action." Evans v. Newton, supra, 382 U.S. at 299, 86 S.Ct. at 488. As plaintiffs put the proposition:

"In many respects, both insofar as the power it exercises over students [sic] and insofar as defendant Columbia University fulfills a public function of educating persons, it may be likened to a 'company town' or a party primary system."[16]

The court has considered these assertions cumulatively as well as singly in concluding that plaintiffs' prayer for a preliminary injunction fails in its inception. It is far from probable that plaintiffs will succeed—it is, more precisely, probable that they will fail—on the initial question of federal jurisdiction.

1. The claim that the University receives large amounts of "government" money is grossly inflated in a significant respect and relatively insubstantial in any event. The "inflation" inheres in the fact that something over 80% of the public funds received by Columbia comes from the Federal rather than the State Government.[17] The jurisdiction upon which plaintiffs call is available for *state*, not for federal, action. Norton v. McShane, 332 F.2d 855, 862 (5th Cir. 1964), cert. denied, 380 U.S. 981, 85 S. Ct. 1345, 14 L.Ed.2d 274 (1965), citing cases; Sigue v. Texas Gas Transmission Corp., 235 F.Supp. 155 (W.D.La.1964), aff'd 354 F.2d 40 (5th Cir. 1965).[18]

▇▇▇ A more fundamental point against plaintiffs is that receipt of mon-

15. These rough figures come from plaintiffs' papers. There are some possible differences between the parties as to the appropriate dollar amounts. But the differences are neither large nor important.

16. Memorandum of Law, p. 9, citing Marsh v. State of Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), and Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953).

17. For the period July 1, 1966, to June 30, 1967, the University's Vice President for Administration reports total revenues of $134,375,780; receipts from the Federal Government of $55,996,582; $10,008,410 from New York City; and $240,936 from New York State. The New York City figure includes $8,632,208 for the University's operation of the City's Harlem Hospital pursuant to an "affiliation agreement." If this sum is left out, as defendants say it should be, the State (which includes the City, of course) payments become small indeed. The court has proceeded on the view that this figure of over $8,000,000 should *not* be excluded.

But as the text states, inclusion of the amount does not help plaintiffs.

18. Contrary to plaintiffs' view, this is entirely consistent with Simkins v. Moses H. Cone Memorial Hospital, supra. That case involved the question of "state action" interwoven with an issue as to constitutionality of a federal statute and regulation. See 323 F.2d at 961. The federal money which was important there went from the National Government to the State, thence to the hospital, the whole scheme being designed to implement a program conducted "as a State function * * *." Id. at 968. Plaintiffs are still less justified in their reliance upon Norwalk Core v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968). As plaintiffs should know even more certainly than others who read, since they are represented by counsel who handled the successful appeal, that case involved no issue whatever of subject matter jurisdiction. See id. at 926 n. 6. And there is nothing notable about the absence of any such issue; state officials, charged with denying equal protection, were defendants in the suit.

ey from the State is not, without a good deal more, enough to make the recipient an agency or instrumentality of the Government. Otherwise, all kinds of contractors and enterprises, increasingly dependent upon government business for much larger proportions of income than those here in question, would find themselves charged with "state action" in the performance of all kinds of functions we still consider and treat as essentially "private" for all presently relevant purposes. See Simkins v. Moses H. Cone Memorial Hospital, supra, 323 F.2d at 967.

2. The serious inquiry is not into the source of the "private" person's or organization's income, but into either or both of two subjects (which are not necessarily separate and distinct from each other):

(a) How far are the State and the formally "private" agency truly independent of each other, or, what amounts to the same thing, how far has the State so "insinuated itself into a position of interdependence * * * that it must be recognized as a joint participant in the challenged activity"? Burton v. Wilmington Parking Authority, supra, 365 U.S. at 725, 81 S.Ct. 856.

(b) To what extent, if at all, is the University engaged in "state action" because, as plaintiffs argue, it "fulfills a public function of educating persons"?

On both of these questions, which are considered by the court to point toward the genuinely material area, plaintiffs' thesis fails.

■ a. There is nothing, even in the somewhat baroque rhetoric of plaintiffs' affidavits and memoranda, to suggest any substantial or relevant degree of interconnection between the State and the University. There is a good deal of talk about the University's large and (it is more than implied) sinister work for the military, diplomatic, and intelligence agencies of the Federal Government. But, as has been noted already, that is no basis for the claim of *state* action upon which plaintiffs must proceed.

■ What is still more striking is the total absence of any indication that the State (or any government) is involved as a participant in the University disciplinary proceedings to which the motion for a preliminary injunction is directed. The major precedents plaintiffs invoke on this subject deal with the problem of racial discrimination as it is affected by the Fourteenth Amendment. The essence of those cases was the intertwining and essential inseparability of governmental facilities, resources, and action with the related energies and materials of the "private" agency— as, for example, in the segregated restaurant in a public building, Burton v. Wilmington Parking Authority, supra, or in a courthouse, Derrington v. Plummer, 240 F.2d 922 (5th Cir. 1956), cert. denied sub nom. Casey v. Plummer, 353 U.S. 924, 77 S.Ct. 680, 1 L.Ed.2d 719 (1957). In such cases, after "sifting facts and weighing circumstances," *Burton,* 365 U.S. at 722, 81 S.Ct. 856, decision went against the State or its official agency (commonly, though not necessarily, named as a defendant) because there was found "that degree of state participation and involvement in discriminatory action which it was the design of the Fourteenth Amendment to condemn." Id. at 724, 81 S.Ct. at 861. Note that the critical "involvement" was in the very "discriminatory action" under constitutional attack. See also id. at 725, 81 S.Ct. 861. It is at most an open question whether the results in the cited cases would entail the conclusion that the restaurants involved would have been acting under "color of" state law had they discharged employees for pleading the privilege against self-incrimination or conducted some sort of discharge hearings involving alleged employee misconduct which was at the same time the basis for criminal charges. Cf. Black v. Cutter Laboratories, 351 U.S. 292, 76 S.Ct. 824, 100 L.Ed. 1188 (1956).

However such subtleties might be worked out, the case here is relatively simple. Plaintiffs show nothing approximating the requisite degree of "state participation and involvement" in *any* of the University's activities, let alone the specific proceedings in question here.

b. Plaintiffs' remaining thought —that Columbia performs a "public function" in "educating persons" which may be "likened to a 'company town' or a party primary system"—is, briefly, without any basis. It is not sounder for Columbia than it would be for Notre Dame or Yeshiva.[19] Of course, plaintiffs are correct in a trivial way when they say education is "impressed with a public interest." Many things are. And it may even be that action in some context or other by such a University as Columbia would be subject to limitations like those confining the State. But nothing supports the thesis that university (or private elementary) "education" as such is "state action." Cases like Marsh v. State of Alabama, supra—where the party held to have offended the Fourteenth Amendment was *Alabama*, not the Gulf Shipbuilding Corporation, owner of the "company town"[20]—are of no help. Even the plaintiffs have not yet suggested that the University must allow all comers to demonstrate within its buildings. Cf. Amalgamated Food Employees, Union Local 590 v. Logan Valley Plaza, Inc. supra, 391 U.S. at 308, 88 S.Ct. 1601. And the suggestion would not matter in any event. For *Marsh* and cases like it tell only how far owners of property used "by the public in general" (326 U.S. at 506, 66 S.Ct. 276) or those who perform functions governmental in character (e. g., Terry v. Adams, supra) may be subject to constitutional limitations upon "state action" *with respect to such property or functions.* No case anywhere, and no acceptable extension of any pertinent principle, indicates that a University like Columbia is engaged in "state action" when it takes such measures and conducts such procedures as those here in question.

### B. *The Merits*

While considerations of legal logic have made jurisdiction the first subject for discussion, the weakness of plaintiffs' case is still clearer in its substantive aspects. Thus, even if there were (or is) jurisdiction, the motion for a temporary injunction would have to be denied.

1. As has been noted, the core theory of the suit is that plaintiffs (or those they purport to represent) had a "right" under the First Amendment to occupy the University buildings, including the President's office, and "non-violently" to imprison a Dean "to dramatize to the University their views and positions concerning fundamental problems affecting their society."[21] From this they reason that anything which would inhibit or "chill" this enterprise offends the Constitution. As has also been noted, this supposed axiom is wrong. See, in addition to cases cited earlier, Buttny v. Smiley, 281 F.Supp. 280 (D.Colo.1968).

Mistaken in their first premise, plaintiffs also fail in their effort to show that the disciplinary proceedings against them are groundless, and thus in a category somehow affected by the rule of Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). That decision is inapposite in all respects, but the possible point of its citation is not a useful subject to dwell upon.

19. If the law were what plaintiffs declare it to be, the difficult problem of aid to "private schools"—specifically, parochial schools—would not exist. Cf. Board of Education of Central School Dist. No. 1 v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); People of State of Illinois ex rel. McCollum v. Board of Education, etc., 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948). Indeed, the very idea of a parochial school would be unthinkable. But cf. Pierce v. Society of Sisters, etc., 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

20. Cf. Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968).

21. Memorandum of Law, p. 27.

550

**2.** Another point argued at length, and totally devoid of substance, is that failure to enjoin the disciplinary proceedings will somehow infringe the privilege against self-incrimination. In the name of the privilege, plaintiffs claim that any student called for a meeting by a Dean concerning the events of April 23–30 (and warned that unexcused failure to turn up will result in suspension) has the right to thumb his nose at the Dean. To enforce this right, it is argued, the federal court should forbid the suspension of any student and bar any further disciplinary proceedings until the pending criminal charges are finally adjudicated in the state courts. Plaintiffs tender a whole series of errors to support this line of argument.

The basic error appeared at the outset (and has been pressed throughout) when plaintiffs' attorneys sent telegrams to the various Deans explaining that it was unconstitutional to require anybody to appear and "testify." It is not disputed (though plaintiffs choose to ignore) that neither the appearance before the Dean nor any other step in the prescribed procedures was an occasion for compelled testimony (or for any adverse inference from silence). The case is clearest with respect to the meeting with the Dean. The student was not expected on this occasion to do more than appear and signify whether further steps in the disciplinary procedures would be required. He could stand mute or plead not guilty, in which case reference to the hearing tribunal was the next step. Or he could admit the charge (a step not unknown even in criminal courts), ending the proceeding at that stage. Nothing in the Fifth or any other Amendment supports plaintiffs' contention that they (and every other student sent a notice) had a right to nullify the disciplinary procedures simply by announcing that they would not appear even to "plead" to the charges.

Perhaps the clearest fallacy in the argument concerning the privilege against self-incrimination is the idea, as it is expressed in the prayer for injunctive relief, that this privilege could somehow justify a blanket order "restraining the defendants from taking any disciplinary action and from instituting disciplinary proceedings" against any of hundreds of individual students in the unknown circumstances of their varying cases. This thought is said to rest upon the ground that the disciplinary charges and the pending criminal prosecutions rest "on the same set of facts." [22] Though this is said in an affidavit of counsel, it not only remains to be demonstrated separately in the hundreds of cases; it is also shown to be probably inaccurate in one of the four specific cases presented with comparative concreteness in the motion papers.

The case in question, mentioned earlier, is the odd one of the student Rudd. His notice from the Dean, concerned with the period April 23–30, was sent on May 16. He was arrested and charged for seemingly separate activities on May 17. It is at least not certain in advance that the charges by the school relate to "the same set of facts" as do those by the State. It may be, of course, that if Rudd's University proceeding had gone to a hearing, valid claims of privilege might have arisen; testimony relating to April 23–30 might conceivably have supplied "a link in the chain of evidence," Blau v. United States, 340 U.S. 159, 161, 71 S.Ct. 223, 224, 95 L.Ed. 170 (1950), affecting events of May 17. Or, since the Joint Committee had concluded that the student "should not be required to give evidence against himself," no question might ever have been presented if Rudd had decided simply to remain silent. But all this must be speculative. The inevitability of such speculation is alone sufficient to show plaintiffs' error in supposing that they may block the disciplinary proceedings in advance and across the board because some students in some specific cases might at some future point have a valid privilege of

22. Affidavit of David G. Lubell, Esq., par. 11.

silence. The error is only made more vivid by the citation of cases which sustained particular claims of privilege in response to particular questions put to witnesses who had appeared, not refused to appear. E. g., Emspak v. United States, 349 U.S. 190, 75 S.Ct. 687, 99 L.Ed. 997 (1955); Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). And plaintiffs' position is not strengthened by Albertson v. Subversive Activities Control Board, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965), upon which they rely. That decision, dealing with a process of registration that has no counterpart here, condemned a procedure requiring the supplying of responsive information of which "the pervasive effect" was "incriminatory * * *." Id. at 79, 86 S.Ct. 194, 199. It affords no justification for plaintiffs' arrogating to themselves the role of "final arbiter of the merits of the claim" of privilege (ibid.) long before there is (and where there may never be) any specific claim to decide.

3. In support of the same point, and the same error, plaintiffs say there is a "practice" of staying administrative proceedings where the individual involved faces criminal charges arising from the same events. While stays of this sort are desirable, and may even be constitutionally required, in the concrete facts of specific cases, see Silver v. McCamey, 95 U.S.App.D.C. 318, 221 F.2d 873, 874–875 (1955), there is no general "practice" of the sort plaintiffs posit. Finfer v. Caplin, 344 F.2d 38

(2d Cir.) cert. denied, 382 U.S. 883, 86 S.Ct. 177, 15 L.Ed.2d 124 (1965); Goldberg v. Regents of University of California, 248 Cal.App.2d 867, 57 Cal.Rptr. 463, 476 (1967); Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 52, 33 S.Ct. 9, 57 L.Ed. 107 (1912). It ought to be obvious that a motor vehicles commissioner, authorized to suspend a driver's license for speeding without more, need not wait for the months or years of a negligent homicide prosecution before considering such administrative action. It is not less obvious that the University need not refrain in every case even from learning whether disciplinary charges are admitted or denied until criminal proceedings, which may or may not implicate the same events, have been brought to their conclusion.[23]

4. Plaintiffs devote many pages to a misconceived argument that the students facing school disciplinary charges are being deprived of substantive due process because Chapter XXXV, § 352, of the University's Statutes is vague and overbroad. This general provision, of ancient vintage, provides:

"* * * The continuance of each student upon the rolls of the University, the receipt by him of academic credits, his graduation, and the conferring of any degree or the granting of any certificate, shall be subject to the disciplinary powers of the University which shall be free to cancel his registration at any time on any grounds it deems advisable."

The quoted statute is, indeed, sweeping in its terms. But the several gross

23. It is unnecessary to the court's conclusions on this general subject, but it is worth noting, that defendant District Attorney Hogan declares in an affidavit "that the prosecution will not offer in evidence on the People's case against any student of Columbia University, any statement, declaration or testimony made by such student on his own behalf in connection with or during the course of the disciplinary proceedings of Columbia University. Further, it has been decided that the prosecution will not utilize the records of the said disciplinary proceedings as a source for discovery of other

evidence against students accused of criminal offenses." Plaintiff law student Rothschild expresses in his affidavit some doubt about the District Attorney's authority to bind himself in this fashion. Plaintiffs' Memorandum of Law (p. 38), citing no higher authority, says defendant Hogan's representation "has no legal impact * * *." If it matters, this court is confident that (1) the question is unlikely to arise, and (2) no court would permit the District Attorney to deviate from his representation, assuming the unimaginable possibility that he would knowingly undertake to do so.

flaws in plaintiffs' argument include the sufficient answer that the students are not being "prosecuted" under this general provision.

As plaintiffs acknowledge,[24] the general provision they choose to quote and argue about (exclusively and at great length) "would do nicely" as "a statement of policy" or "a preface to a specific code of prohibited conduct * * *." And that, at least for present purposes, is all it is. Though plaintiffs prefer to ignore it in their brief, while attacking it as an offensive "edict" in their complaint, a specific University rule, in effect from September 25, 1967, has (a) recognized the role of "peaceful picketing" as one "legitimate mode of expression" among others "whereby that freedom of opinion which is basic to the health of a democratic society may be exercised," (b) forbidden coercive and violent picketing, and (c) provided, in a subsection directly pertinent here:

"Picketing or demonstrations may not be conducted within any University building."

The affidavit of defendant President Kirk recites the experience of threats to person and property which led to the announcement of this prohibition. But there is no question as to the reasonableness of the restriction. It is enough for now that it undisputedly exists even though it is ignored in the extended assault plaintiffs prefer to make upon the general "statute" in Chapter XXXV.

Elsewhere, while on another subject, plaintiffs seem to help demolish their contention that the University gives insufficient warning of prohibitions for the violation of which disciplinary proceedings may be instituted. In their Supplemental Memorandum (pp. 20–21), arguing that Columbia exercises such pervasive powers over students that it should be treated as a "state" for Fourteenth Amendment purposes, they say "school regulations encompass almost the total of the student's daily life—" dictating "where a student may live, the hours when he may entertain guests and often the manner in which he can do so, the limits on what he is permitted to say, and how and where he is to say" (citing for this last the "fiat" against indoor demonstrations).

The subject has detained us too long already. Plaintiffs' extended essay on "vagueness" and "overbreadth" is a pointless excursion in the actual circumstances of the case.[25]

5. Having undertaken to thwart and obstruct the disciplinary proceedings in their inception, plaintiffs now pick their way through the procedures outlined by the Joint Committee on Disciplinary Affairs and contend that these deny procedural due process. The argument lacks merit for reasons which can be stated briefly:

(a) Viewed generally, in advance of any specific problems that might arise in specific cases, the prescribed procedures, sufficiently sketched above, seem entirely fair and amply protective of student rights. They are not required, obviously, to duplicate the criminal trial process. Bearing in mind that the process which is "due" may vary with the nature of the subject and the occasion, Wright v. Texas Southern University, 392 F.2d 728, 729 (5th Cir. 1968); Dixon v. Alabama State Board of Education, 294 F.2d 150, 155–156, 158–159 (5th Cir.), cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961); Wasson v. Trowbridge, 382 F.2d 807, 811–812 (2d Cir. 1967); Barker v. Hardway, 283 F.Supp. 228, 236–237 (S.D.W.

---

24. Memorandum of Law, p. 56.

25. Of course, nothing said on this subject is intended to suggest that a school, public or private, must proceed upon written rules or "statutes" before it may impose discipline. See Barker v. Hardway, 283 F.Supp. 228, 235 (S.D.W.Va.1968), and cases there cited; Buttny v. Smiley, 281 F.Supp. 280, 284–286 (D.Colo.1968). It is enough here that plaintiffs do not present even the comparatively interesting question which might arise if the University were in fact proposing to penalize alleged misbehavior in the absence of any rules or intelligible rules.

Va.1968); Buttny v. Smiley, 281 F.Supp. 280, 288–289 (D.Colo.1968), the court perceives no valid basis whatever for the abstract criticisms plaintiffs tender.

■ (b) The vice of abstractness is itself a separate ground for dismissing the arguments concerning procedural due process. Plaintiffs chose not to appear even at the step preceding the hearing process, but they now find a variety of objectionable things in that untried process. There was no occasion to test, and no opportunity to cure in concrete terms, the flaws they claim to discern. So, for example, had plaintiffs presented in an actual case their assertion that the hearing rules unduly circumscribed the participation of counsel, the hearing tribunal might have obviated the problem by construing differently, or choosing to relax, the specific item of alleged restriction. What the court may not and will not countenance is the proposition that procedures plaintiffs decided unilaterally to nullify—procedures obviously designed in an earnest effort to assure fundamental fairness—must be condemned out of hand as basically and inevitably deficient.

### IV.

The cross-motion of defendant trustees and university officials seeks summary judgment dismissing the complaint for want of jurisdiction, attacking plaintiffs' "state action" theory treated earlier in this opinion. As has been indicated, there is on the papers before the court great force in this contention. Nevertheless, final action upon the cross-motion will be withheld pending further exploration of the kind contemplated by Fed.R.Civ.P. 56 (e) and (f). The reasons for this postponement and the possible subjects for additional inquiry, subject to consultation with counsel, are briefly sketched here for the guidance of all of us.

■ 1. Plaintiffs say that further discovery will expand and strengthen their thus far inadequate showing of "relationships" identifying Columbia

with the City and State of New York. If the success of the proposed venture seems unlikely, its failure is not certainly predictable. And the relevant information is largely or wholly in defendants' possession or control. Given the familiar presumptions against cutting off possibly material fact questions without a trial, and because the subject is one calling for particularized factual analysis, Evans v. Newton, 382 U.S. 296, 299–300, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966), the granting of defendants' motion in this posture would seem unwise.

■ 2. Whether or not the University and its people are engaged in "state action," and whether or not there is any substantive merit in the attack upon the disciplinary proceedings, additional issues may be posed because the defendants also include District Attorney Hogan and Police Commissioner Leary. Official action by them is, of course, state action. There may be in the sprawling verbosities of the complaint implications of joint responsibility and liability as between these two and the others for alleged wrongs other than those involved in the preliminary injunction motion. The subject is not necessarily disposed of in the papers and arguments thus far submitted.

3. The defendants who make the cross-motion, seeking dismissal of the complaint as a whole, have not condescended upon details which may require specific attention in deciding whether such relief should be granted in part if it is not granted in full:

(a) Is any claim upon which relief could be granted stated on behalf of the plaintiff alumnus or plaintiffs who are "members of the community adjacent to or affected by the plans, programs, and policies of Columbia University"?

(b) Should any of the separate "causes of action" (e. g., to order changes in the University's structure or forbid future "surrenders of the campus" to the police) be stricken because they state no claims in themselves and are

554

immaterial to any claims which may arguably be stated?

The answers to questions like these, if favorable to defendants, may not result in final dismissal of the action, but may conceivably require striking portions or dismissal of the whole complaint with leave to replead. It is not necessary now, however, to predict where the suggested lines of further study may lead. The useful next step is to confer again with counsel and determine (a) what discovery efforts should now be allowed plaintiffs in support of their jurisdictional theory, and (b) what further submissions should be taken by the court before the pending application for summary judgment is determined. To that end, the court will set a conference for a date in the near future. In the meantime, action upon the pending cross-motion will be withheld.

As to plaintiffs' motion for a preliminary injunction, it is, for reasons stated above, in all respects denied. So ordered.