Darcel L. **BRIGHT**, by her next friend, Betty L. Royal, Dolly Woods, by her next friend, Arline Woods, individually and on behalf of all other students similarly situated, Plaintiffs,

v.

Donald **ISENBARGER**, individually and in his capacity as principal of Central Catholic High School; J. William Lester, individually and in his capacity as Superintendent of the Fort Wayne-South Bend Diocesan Schools, Defendants.

No. 70 F 38.

United States District Court, N. D. Indiana, Fort Wayne Division.

July 6, 1970.

---

68. See p. 147, State Transcript.

69. See p. 59, State Transcript.

Ivan E. Bodensteiner, Fort Wayne, Ind., for plaintiffs.

Jerome J. O'Dowd, Fort Wayne, Ind., for defendants.

## MEMORANDUM OF DECISION AND ORDER

ESCHBACH, District Judge.

This action is before the court upon plaintiffs' motion for a preliminary injunction and upon the defendants' motion to dismiss for failure to state a claim upon which relief may be granted. Plaintiffs, two high school sophomores, seek *inter alia* to be readmitted into Central Catholic High School, a private parochial secondary school owned by the Roman Catholic Diocese of Fort Wayne-South Bend and operated under the direct supervision of defendant Reverend Donald Isenbarger, its principal, and his superior, defendant Monsignor J. Wm. Lester, the Diocesan Superintendent of Schools. Plaintiffs, who were expelled from Central Catholic High School for violation of a school disciplinary rule, contend that the manner in which they were expelled violated their Fourteenth Amendment right to procedural due process.

The complaint is in two counts: Count I alleges a cause of action under 42 U.S.C. § 1983 and asserts jurisdiction under 28 U.S.C. § 1343, and Count II alleges that defendants deprived plaintiffs of a property right arising out of their payment of tuition without due process of law and asserts jurisdiction under 28 U.S.C. § 1331. The court conducted an evidentiary hearing upon both motions on May 4, 1970. This case in its present posture presents an important constitutional question: Does the Fourteenth Amendment apply to the internal operations of defendants' parochial secondary school.

For the reasons discussed below, plaintiffs' motion for a preliminary injunction will be denied and defendants' motion to dismiss for failure to state a cause of action will be granted. In reaching these results, this court has been mindful of the profound significance of the issues before it. Consequently, this court considered it desirable to state as fully as possible the reasons for its conclusion that Central Catholic High School is not amenable to the due process clause of the Fourteenth Amendment.

## I. FACTS

### A. *Central Catholic High School: Characteristics and Purposes*

As noted at the outset, this case involves the expulsion of the two plaintiffs from a private high school owned and operated by the Roman Catholic Church. The Catholic Church encourages Catholic parents to send their children to its schools so that they may be educated in a consciously maintained religious environment. Nearly half of the faculty at Central Catholic High School are members of a Catholic religious order, the principal is a Catholic priest, and the school regularly conducts religious services as part of its program. The local Catholic churches from whose geographical areas students come contribute one-third of the costs of each student's education. Attendance at Central Catholic High School is conditioned upon the payment of tuition of $200 per year for one child. Approximately one-half of the children of Catholic parents in the Fort Wayne-South Bend Diocese attend parochial schools.

Although Central Catholic High School does not bar students who are not adherents to the Roman Catholic faith from attending, over 98 per cent of the 1,000-plus student body are of the Catholic faith. This results from the fact that the school consciously encourages adherence to the Roman Catholic faith. In addition to conducting Catholic religious observances and services and teaching religion, the school has an "executive board" which advises the principal on appropriate discipline when a student shows "public disrespect or ridicule" toward (1) "the Catholic Church or Holy Father," (2) "our country or the office of the President," and (3) "any member of the C.C. faculty or staff."

As Chief Justice Burger has recently stated, parochial elementary and secondary schools

> "plainly tend to assure future adherence to a particular faith by having control of [children's] total education at an early age. No religious body that maintains schools would deny this as an affirmative if not dominant policy of church schools." Walz v. Tax Comm'n of City of New York, 397 U.S. 664, 90 S.Ct. 1409, 1412–1413, 25 L. Ed.2d 697 (1970). *See* Board of Educ. v. Allen, 392 U.S. 236, 254–269, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (dissenting opinion of Douglas, J.).

B. *Central Catholic High School: Relationship with State of Indiana*

The parties have stipulated to most of the facts concerning the relationship between Central Catholic High School and the State of Indiana.

By law, every child in Indiana between seven and seventeen years of age must attend a public school "or other school taught in the English language." Ind.Stat.Ann. § 28–505 (Burns' 1968 Cum.Supp.). If a child does not attend the public school, in order to comply with the compulsory attendance law, the school he does attend must be in session

for the same period of time as the public school. *Id.* It is unlawful for parents to refuse to send their child to public school, provided, however, that the parent is excused from this duty if the child "is being provided with instruction equivalent to that given in [the] public school[s]." *Id.* § 28–505o (Burns' 1968 Cum.Supp.).

Indiana imposes two specific requirements as to what must be taught in all schools within the State. All students in grades six through twelve must receive instruction on the federal and State constitutions and the method of such instruction and course materials may be established by the State Board of Education. *Id.* §§ 28–3406 to 3406c (Burns' 1948 Repl.). Similarly, all schools in the State are required to teach a one semester course in safety education in the eighth grade and the State Board of Education is responsible for the course of study and the study materials. *Id.* §§ 28–3425 to 3427. More broadly, the State also requires every teacher in the State to present his instruction

> "so as to give special emphasis to common honesty, morality, courtesy, obedience to law, respect for the national flag, the constitution of the United States and the constitution of the state of Indiana, respect for parents and the home, the dignity and necessity of honest labor and other lessons of a steadying influence, which tend to promote and develop an upright and desirable citizenry." *Id.* § 28–3428.

The State provides indirect financial assistance to private schools. Private schools are exempt from property taxes. *Id.* § 64–201 (Burns' 1969 Supp.). Where children who attend any parochial school reside on a "regular route of a public school bus," transportation "without extra charge" is provided along the regular bus route for such parochial school children. *Id.* § 28–3903 (Burns' 1968 Cum.Supp.). Central Catholic High School participates in the federal school lunch program, 42 U.S.C. §§ 1751–1761

(1964). The evidence before the court is silent, however, upon the issue of whether Central Catholic High School receives any *State* funds as a result of its participation in this federal program. The school does, however, receive from the federal government food commodities and ten (10) cents per meal served to its pupils under this program.

The State of Indiana, through the State Board of Education (hereinafter "Board"), does not of its own initiative undertake to accredit, certify or otherwise classify private or parochial schools in the State. However, if a private or parochial school makes a request, the Board will inspect and, if the school meets the specifications required for a certificate or commission, will issue the appropriate certificate or commission. There are four types or classes of certificates or commissions which the Board may issue, and the requirements for each of these four commissions are contained in 2 Adm.Rules & Regs. § 28–3413(2) to (5) (Burns' 1967). In order to qualify for one of the four classes of commissions, the school must meet various requirements concerning length and content of instruction, qualifications and training of principal and teachers, prerequisites for graduation, quality of the school's instructional and physical facilities, etc. There are, however, no regulations or statutes governing or concerning the content of a school's disciplinary rules or the method(s) by which such rules shall or may be enforced or implemented.

There are three considerations which may persuade a private school, although not explicitly required to do so by any State regulation or statute, to request Board certification or commissioning. First, when a student desires to enter any of the public schools of the State of Indiana and has received a part of his previous education at a private school, the public schools are not required to give him credit for scholastic work or achievement done at another school within the State unless that other school was certified or commissioned by the Board. Second, the four State universities will not permit their students in education to receive academic credit for practice teaching unless that teaching is done in a school certified or commissioned by the Board. Third, a prerequisite to membership in the Indiana High School Athletic Association (IHSAA) is that the high school hold a certificate or commission from the Board. No member of the IHSAA may participate in interscholastic athletic activities with a nonmember high school. Central Catholic High School is a member of the IHSAA.

Central Catholic High School has requested the Board to inspect and to certify it. On March 13, 1969, the Board issued Central Catholic High School a "first class commission," *see* 2 Adm. Rules & Regs. § 28–3413(4) (Burns' 1967), which is next to the highest classification issued by the Board. At all times that Central Catholic High School holds a commission from the Board, it must permit visits, inspections, or evaluations by the Inspection Division, Office of the State Superintendent of Public Instruction.

### C. *Expulsion of Plaintiffs*

There is no material dispute over the relevant facts preceding and surrounding the expulsion of the plaintiffs. At the start of the school year in September 1969, the principal of Central Catholic High School, defendant Reverend Isenbarger, addressed a general assembly of the student body and explained that, as during the four prior years, the school would be conducted as a "closed school," *i. e.*, all students would be required to be present at assigned periods from 8:15 a. m. until 3:10 p. m. on all school days unless given explicit permission to be absent. If a student arrived after 8:15 a. m., he or she must obtain an admission slip from the attendance office. The principal stated that he considered tardiness a serious violation of school rules. Reverend Isenbarger further explained that the sanction for the first serious violation of school rules,

such as tardiness, would be suspension for a definite period and final probation, which constitutes a warning that the student is liable to expulsion for any further serious disciplinary violation. Students were aware that Reverend Isenbarger as principal was primarily responsible for discipline and this fact was also general knowledge among the parents of the students.

The meaning and significance of final probation and suspension for disciplinary violations were again explained by the principal at a general assembly of students on November 7, 1969. It was made clear at this time that if a student placed upon final probation committed a second serious violation, he or she would be expelled.

In his capacity as principal, Reverend Isenbarger orally informed Central Catholic High School students during the week of January 5 and again during the week of January 12, 1970, by public address announcements, that they were prohibited from entering upon the premises of Central High School, a public school across the street, before and after Central Catholic High School's regular school hours. He further told them that violation of this rule would result in suspension and final probation.

On February 12, 1970, Reverend Isenbarger personally saw three students, including the two plaintiffs herein, leaving Central High School at 8:15 a. m. Plaintiffs did not deny that they had been in Central High School and did not offer any explanation for their action when given the opportunity to do so. Plaintiffs were suspended for a day and placed upon final probation by the principal, and an entry of that status was made by the Dean of Discipline. On March 6, 1970, the principal called seven girls into his office, all of whom had sought admission to school at approximately 9:30 a. m. Upon inquiry by Reverend Isenbarger, all seven girls, including the two plaintiffs, admitted attending a "pep rally" at Central High School in violation of the rule prohibiting visiting Central High School. The principal

informed them that this meant final probation and suspension. He further notified them that if any one of them was already on final probation, it would mean expulsion. He then referred all seven girls to the Dean of Discipline who, upon noting that both plaintiffs were then on final probation, informed plaintiffs that they were expelled and sent written notices of that fact to their mothers.

On March 9, 1970, both plaintiffs, accompanied by their mothers, met with Reverend Isenbarger who explained why plaintiffs had been expelled. The principal also explained to the plaintiffs and their mothers that they would be readmitted to Central Catholic High School, if they so desired, for the fall term in September 1970. Furthermore, he told them that if the plaintiffs took advantage of the summer school program of the public high schools and successfully completed such summer work, they would be eligible to reenter Central Catholic High School in September 1970 as members in good standing of the junior class. Subsequently, on March 13, 1970, plaintiffs, their mothers, and their attorney had a conference with defendant Monsignor Lester. The Diocesan Superintendent of Schools declined to reverse the decision of the principal, Reverend Isenbarger. This suit was filed on April 8, 1970.

## II. FRAMEWORK OF ANALYSIS

■ It is important at the outset to recognize the nature of the question which is before this court. Count I of the complaint alleges a cause of action under § 1983. The terms of § 1983, as plaintiffs recognize, make plain two elements that are necessary to state a cause of action. E. g., Adickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (U.S. June 1, 1970). First, plaintiffs must prove that the defendants have deprived them of a right secured by the "Constitution and laws" of the United States. Second, plaintiffs must show that defendants deprived them of this constitutional right "under

color of any statute, ordinance, regulation, custom or usage, of any State." This second element requires that plaintiffs show that defendants acted "under color of law." *Id.* at 150, 90 S.Ct. at 1604.

In cases under § 1983, the requirement of "under color of law" has been consistently treated by the Supreme Court as the same thing as the "state action" required under the Fourteenth Amendment. *E. g.*, United States v. Price, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966) (and cases therein cited). Thus, if plaintiffs prove that conduct on the part of defendants constituted "state action," they would also prove that it constituted action "under color of law" within § 1983. *Id.*

### A. *Not Simply a "State Action" Problem*

This case could be viewed simply as calling upon this court to determine whether the plaintiffs, two high school sophomores, were deprived of their "Fourteenth Amendment rights" by the manner in which they were expelled from Central Catholic High School. Viewed in this way, the threshold issue would be: Whether Central Catholic High School's actions constitute "state action." Thus, this case could be approached as merely another state action problem.

In a fundamental sense, however, this case involves much more than "merely another state action problem." Most "state action" cases have involved a determination of whether otherwise "private" racial discrimination has become "*so entwined with governmental policies or so impregnated with a governmental character as to become subject to the* constitutional limitations placed upon state action." Evans v. Newton, 382 U. S. 296, 299, 86 S.Ct. 486, 488, 15 L.Ed.2d 373 (1966); Burton v. Wilmington Parking Auth., 365 U.S. 715, 722–726, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). As the Supreme Court later explained its holding in *Burton*:

"[T]here is 'state action' whenever the 'State has so far insinuated itself into a position of interdependence [with the otherwise "private" person whose conduct is said to violate the Fourteenth Amendment] * * * that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so "purely private" as to fall without the scope of the Fourteenth Amendment.'" United States v. Price, *supra*, 383 U.S. 787, at 794 n. 7, 86 S.Ct. 1152, at 1157, 16 L. Ed.2d 267 (insertion in original).

Such an inquiry is necessary because Section 1 of the Fourteenth Amendment guarantees an individual's right to due process and equal protection of the law *only* as against deprivations by "such action as may fairly be said to be that of the States." Shelley v. Kraemer, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948); Civil Rights Cases, 109 U.S. 3, 10–18, 3 S.Ct. 18, 27 L.Ed. 835 (1883). As one commentator has aptly observed:

"[Phrases such as 'Fourteenth Amendment rights'] are necessary shorthand but they all too easily obscure the critical correlation between duty and right. The only duties imposed by section 1 of the fourteenth amendment are those of a state to * * * deprive no one of life, liberty, or property without due process of law. * * * The imposition of such duties implies the existence of affirmative rights, but to speak of 'Fourteenth Amendment rights' *simpliciter* suggests that they are rights in rem, good against all the world regardless of the limited nature of the duties from which they are derived. The only rights exactly correlative to the duties imposed by the fourteenth amendment are rights against the state, not against private individuals." Cox, "Constitutional Adjudication and the Promotion of Human Rights," 80 Harv.L.Rev. 91, 110 (1966).

Consequently, *Burton, Evans,* and their progeny have been concerned with determining whether under the facts and circumstances of a particular case "pri-

vate" conduct should be subjected to the constitutional restrictions placed upon state action.

■ It should here be observed that under Count II of their complaint, plaintiffs must also demonstrate the same "state action" which they must prove under Count I, which purports to state a § 1983 action. Although Count II does not purport to rest upon § 1983, nevertheless it does allege a deprivation of a property right (instruction in exchange for payment of tuition) in violation of the due process clause of the Fourteenth Amendment. As has already been stated, only "state action" is within the prohibitions of the Fourteenth Amendment. Consequently, because *both* Counts I and II necessitate a showing of "state action," the balance of this opinion will apply to both counts' failure to state a cause of action, even though only the § 1983 (Count I) will be explicitly referred to.

■ Other "state action" cases have not required courts to reconcile the possible variance between several constitutionally guaranteed rights. No case of which this court is aware has explicitly considered the situation where, as here, the type of "private" conduct—operation of private schools—challenged under the Fourteenth Amendment is itself among those fundamental personal liberties which are protected by the Fourteenth Amendment. *See* Griswold v. Connecticut, 381 U.S. 479, 482–486, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Thus, unlike private acts of racial discrimination, the right of parents and children to establish and attend private and parochial secondary schools is a constitutionally protected right. *See* Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1924).

■ Although the Fourteenth Amendment of its own force does not prohibit private conduct which may deprive another individual of procedural due process or equal protection, such private conduct is *not* among the fundamental personal liberties which are con-

sidered so important by our society that they receive constitutional protection. Accordingly, the practice of racial discrimination and other forms of arbitrary private conduct are not constitutionally guaranteed, protected, or authorized. To the contrary, under Section 5 of the Fourteenth Amendment, it appears that Congress has the authority to prohibit such private conduct. *See* United States v. Guest, 383 U.S. 745, 761–762, 86 S.Ct. 1170, 16 L.Ed.2d 239 (opinion of Clark, J., joined in by Black and Fortas, JJ.), 781–784, 86 S.Ct. 1170 (opinion of Brennan, J., joined in by Warren, C. J., and Douglas, J.) ; Frantz, "Congressional Power to Enforce the Fourteenth Amendment against Private Acts," 73 Yale L.J. 1353 (1964) ; Cox, "Constitutional Adjudication and the Promotion of Human Rights," supra at 99–121. *Cf.* Jones v. Alfred H. Mayer Co., 392 U.S. 409, 437–444, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) (Sec. 2 of XIII Amend. authorizes Congress to prohibit private racial discrimination) ; Katzenbach v. Morgan, 384 U.S. 641, 650–651, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966). Under its commerce power, Congress has prohibited private discrimination in many areas, such as public accommodations (42 U.S.C. § 2000a et seq.), employment (*id.* § 2000e et seq.), and housing (*id.* §§ 3601–3619). Moreover, the states may not encourage or authorize any such private denials of due process or equal protection, but must instead remain strictly neutral with respect to such private conduct. *See* Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967) ; Evans v. Newton, *supra*, 382 U.S. at 305–306, 86 S.Ct. 486 (concurring opinion of White, J.) ; Burton v. Wilmington Parking Auth., *supra*, 365 U.S. at 726, 81 S.Ct. 856 (concurring opinion of Stewart, J.).

B. *Constitutional Right of Parents to Educate Children in Private Parochial High Schools*

Unlike other state action cases, a finding of state action in this case would re-

quire this court to reconcile these two plaintiffs' right to procedural due process with other considerations of constitutional dimension. Plaintiffs seek to require that Central Catholic High School's internal disciplinary procedures adhere to procedural due process requirements which have been found applicable to public schools. *See, e. g.,* Dixon v. Alabama State Bd. of Educ., 294 F.2d 150 (5th Cir.1961), cert. denied, 368 U. S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193. *See generally* Wright, "The Constitution on the Campus," 22 Vand.L.Rev. 1027, 1059–1088 (1969). Insofar as *Dixon*-type procedures would require a change in Central Catholic High School's disciplinary practices, the liberty of parents who choose to send their children to Central Catholic High School and the liberty of other children who choose to attend this school would be restricted.

Nearly fifty years ago in Pierce v. Society of Sisters, *supra,* the Supreme Court unanimously struck down a state statute which would have prohibited private primary schools because it unreasonably interfered with the "right to educate a child in a school of the parents' choice—whether public or private or parochial * * *." Griswold v. Connecticut, *supra,* 381 U.S. at 482, 85 S.Ct. at 1680 (reaffirming *Pierce* at 483, 85 S. Ct. 1678). *Pierce* had relied upon Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) which held that a state's desire to foster a homogenous people by prohibiting the teaching of German in private primary schools unreasonably interfered with the "fundamental right" of parents to control the education of their own children. *See also* Farrington v. Tokushige, 273 U.S. 284, 47 S.Ct. 406, 71 L.Ed. 646 (1927).

 Taken together, *Pierce* and *Meyer* reaffirm the pluralistic nature of our society which encourages maximum freedom for individual expression of preferences and emphases—including the selection of methods of education. *Cf.* Walz v. Tax Comm'n, *supra,* 90 S.Ct. at 1421–1424 (concurring opinion);

Greene v. Howard Univ., 271 F.Supp. 609, 613–615 (D.D.C.1967) (Holtzoff, J.), rev'd on other grounds, 412 F.2d 1128 (D.C.Cir.1969). *See generally* "Developments in the Law—Judicial Control of Actions of Private Associations," 76 Harv.L.Rev. 983, 988–994, 1055–1068 (1963) (advantages of pluralism); "Developments in the Law—Academic Freedom," 81 Harv.L.Rev. 1045, 1062–1064 (1968) [hereinafter "Academic Freedom"]. Private schools perform a valuable social function by providing a diversity that the government may not and should not provide in public schools. As the Supreme Court has stated, the "ideal" of public education is "secular education and political neutrality" and this goal requires that public education "not be partisan or enemy of any class, creed, party, or faction." West Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943). On the other hand, because it is nongovernmental, private education is not restricted to the same nonpartisan and secular goals as public education must be. *See* "Academic Freedom," *supra* at 1062–1064.

 Accordingly, private schools may provide religious instruction and conduct religious services while public schools may not. *See, e. g.,* School Dist. of Abington Township v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). Private schools may propagate a sectarian viewpoint while public schools may not. *See, e. g.,* Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). Indeed, as Chief Justice Burger indicates in *Walz,* quoted above, a dominant purpose of parochial schools is the cultivation of such a sectarian perspective.

 In addition, private schools may discourage criticism and irreverence toward existing institutions or policies while public schools may not. *See, e. g.,* Tinker v. Des Moines Indep. Com. Sch. Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). Private schools

may emphasize moral development and strict discipline in ways which public schools may not employ. *See generally* Wright, "Constitution on the Campus," *supra.* Private schools may impose disciplined conformity of dress, speech and action, such as found in military schools and to a lesser extent in most private schools, which public schools may not. *See, e. g.,* Breen v. Kahl, 419 F.2d 1034 (7th Cir. 1969), cert. denied 398 U.S. 937, 90 S.Ct. 1836, 26 L.Ed.2d 268 (U.S. June 1, 1970); Richards v. Thurston, 304 F.Supp. 449 (D.Mass.1969) (Wyzanski, J.).

Three recent decisions have *denied* the application of the Fourteenth Amendment to the disciplinary procedures of private colleges and universities. Powe v. Miles, 407 F.2d 73, 79–82 (2d Cir. 1968) (Friendly, J.); Browns v. Mitchell, 409 F.2d 593 (10th Cir. 1969) (Murrah, C. J.); Grossner v. Trustees of Columbia Univ., 287 F.Supp. 535, 546–549 (S.D.N.Y.1968). Since these cases held that there was no state action, they were not required to explicitly reconcile the requirements of procedural due process which are applicable to state universities with the fundamental personal rights of parents to maintain and of students to attend such private universities and with the social benefits of diversity and pluralism. However, a careful reading of these decisions suggests that these courts were aware of the widespread effect upon the independent operations of private colleges which a finding of state action might, and probably would, necessitate. Rejecting the contention that because it educates people, Columbia University performs a public function and is *ipso facto* subject to the Fourteenth Amendment, Judge Frankel noted that:

> "If the law were what plaintiffs declare it to be, the difficult problem of aid to 'private schools'—specifically, parochial schools—would not exist. Indeed, the very idea of a parochial school would be unthinkable." Grossner v. Trustees of Columbia Univ., *supra* at 549 n. 19 (citations omitted); Greene v. Howard Univ., *supra.*

·With this perspective in mind, we address the threshold question in this case: Was the defendants' expulsion of the plaintiffs from Central Catholic High School "state action"?

## III. PLAINTIFFS FAIL TO STATE A CAUSE OF ACTION UNDER § 1983

### A. *Introduction to the "State Action" Inquiry*

 Almost all applications of the Fourteenth Amendment to private conduct based upon a finding of "state action" have involved an attack upon "private" racial discrimination. There is no allegation of racial discrimination in the complaint, and plaintiffs specifically disavow any claims of racial discrimination in their brief. The court notes the absence of any claim of racial discrimination in this case because it appears that the "state action" doctrine has developed in response to efforts to eliminate certain forms of private racial discrimination. As Justice Brennan recently observed:

> "The state action doctrine reflects the profound judgment that denials of equal treatment, and *particularly* denials on account of race or color, are singularly grave when government has or shares responsibility for them. * * * [S]omething is *uniquely* amiss in a society where the government, the authoritative oracle of community values, involves itself in racial discrimination. Accordingly, in the cases that have come before us this Court has condemned significant state involvement in racial discrimination, *however subtle and indirect* it may have been and whatever form it may have taken." Adickes v. S. H. Kress & Co., *supra,* 398 U.S. at 190, 90 S.Ct. at 1620 (opinion of Brennan, J., dissenting on other grounds) (emphasis added).

 This development of the "state action" doctrine is understandable because, as the Supreme Court has stated, "[t]he clear and central purpose of

the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States." Loving v. Virginia, 388 U.S. 1, 12, 87 S. Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967); McLaughlin v. Florida, 379 U.S. 184, 191–192, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 71–72, 21 L.Ed. 394 (1873). Moreover, the application of the Fourteenth Amendment's restrictions to instances of private racial discrimination in which the state has become "significantly" implicated is consistent with the broad social consensus against racial discrimination not only when practiced by states but also when practiced in many types of private activities. This social consensus against private racial discrimination in areas such as public accommodations, housing and employment is formally expressed by civil rights legislation which has been enacted at the federal (e. g., 42 U.S.C. §§ 2000a et seq., 2000e et seq., and 3601–3619), state (e. g., Ind.Stat.Ann. §§ 40–2307 to 40–2328 (Burns' 1965 Repl.)), and local (e. g., Ft. Wayne, Ind., Ordinance Creating Metro. Human Relations Comm., May 12, 1970) levels of our government.

■ As discussed in II B, *supra,* our society values diversity and pluralism, especially in the area of education. Furthermore, as evidenced by the central meaning of the Fourteenth Amendment and the multiplicity of civil rights laws, our society, speaking authoritatively through its laws, has set itself against discrimination on the basis of race. On the other hand, the origins and central meaning of the Fourteenth Amendment and our basic societal values, as expressed by our laws, do *not* indicate that the constitutional requirement of due process which establishes the framework of the relationship between government and individuals should also be the standard for relationships between private individuals and organizations. *Cf.* Black v. Cutter Labs., 351 U.S. 292, 76 S.Ct. 824, 100 L. Ed. 1188 (1956). This is particularly

true in the context of educational institutions. *See* II B, *supra.* As expressed by one commentator, "The benefits of diversity of educational institutions argue against fitting all private schools to the same procrustean bed [as public schools]." "Academic Freedom", *supra* at 1063. *See generally* H. Friendly, The Dartmouth College Case and the Public-Private Penumbra (1969). Furthermore, as discussed above, the right to maintain and attend private schools is among our fundamental personal liberties.

Plaintiffs cite only two "state action" cases which do not involve attacks upon racial discrimination. The facts of both these cases are distinguishable from this case and their reasoning is inapplicable. In Public Util. Comm. v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952), the First and Fifth Amendments were applied to a Washington, D.C., transit company's decision to broadcast radio programs on its vehicles. Because a governmental agency had investigated and approved the specific activity challenged, the federal government was found to have become "sufficiently involved" in the "responsibility for the radio program to make the First and Fifth Amendments * * * applicable to this radio service." *Id.* at 461–463, 72 S.Ct. at 820. Here, on the other hand, plaintiffs admit that the state is in no way involved in the formulation or enforcement of Central Catholic High School's disciplinary rules. The other case, Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), is not properly a "state action" case. It was the State of Alabama, not a private person, which was prohibited from enforcing its criminal trespass law against an individual distributing religious literature on publicly utilized portions (sidewalks) of a town which was indistinguishable from any other municipality except that it was wholly owned by a private company. In a non-race discrimination "state action" case which plaintiffs do not cite, Meredith v. Allen County War Mem. Hosp. Comm'n, 397 F.2d 33

(6th Cir. 1968), the defendants were a commission appointed directly by the county governing body and private persons who were alleged to have conspired with these governmental appointees. In this case, defendants were appointed by a Roman Catholic Bishop.

Although no court has held that a different (less demanding) standard of what constitutes "sufficient" state involvement is applicable where there are allegations of racial discrimination, the fact that only a handful of the successful "state action" cases have not involved challenges to racial discrimination and the considerations of diversity and pluralism suggest this possibility. *See* Van Alstyne & Karst, "State Action," 14 Stan.L.Rev. 3 (1961); Black, " 'State Action', Equal Protection, and California's Proposition 14," 81 Harv. L.Rev. 69 (1967). Cf. Adickes v. S. H. Kress & Co., *supra*, 398 U.S. at 188, 90 S.Ct. at 1619 (opinion of Brennan, J., dissenting on other grounds) (quoted above). Moreover, Judge Friendly, writing for the Second Circuit, did imply this conclusion when he wrote:

> "We perceive no basis for holding that the grant of scholarships and the financing of [the College of Ceramics on the Alfred Univ. Campus] imposes upon the State a duty to see that Alfred's overall policies with respect to demonstrations and discipline conform to First and Fourteenth Amendment standards so that state inaction might constitute an object of attack. Whether this would be true if Alfred were to adopt *discriminatory admission policies* [citation omitted] *is a different question* we need not here decide." Powe v. Miles, *supra*, 407 F. 2d at 81 (emphasis added).

B. *No State Involvement in Challenged Actions of Defendants*

■ Plaintiffs contend that because the State of Indiana regulates educational standards in private secondary schools and grants private schools tax exemptions, defendants' expulsion of plaintiffs constitutes "state action." Almost identical arguments directed against the disciplinary procedures of private colleges and universities have been rejected by at least three courts where, as here, there was no state involvement in the challenged activity. Powe v. Miles, *supra* at 81; Browns v. Mitchell, *supra*, 409 F.2d at 596; Grossner v. Trustees of Columbia Univ., *supra*, 287 F.Supp. at 548.

The reasoning of these three cases is perhaps best exemplified by Judge Friendly's response to the contention that because the State of New York regulates educational standards in private schools and universities, the disciplinary proceedings of such private schools are state action.

> "[This contention] overlooks the essential point—that the state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury. [Citations omitted.] When the state bans a subject from the curriculum of a private school, as in *Meyer* [*supra*] * * * its responsibility needs no elucidation. State action would be similarly present here * * * if New York had undertaken to set policy for the control of demonstrations in all private universities * * *. [Citation omitted.] But the fact that New York has exercised some regulatory powers over the standard of education offered by Alfred University does not implicate it generally in Alfred's policies toward demonstrations and discipline." Powe v. Miles, *supra*, 407 F.2d at 81.

Plaintiffs do not contend that the State of Indiana was in any way involved in the challenged actions of the defendants. Rather, they contend that the *other* ways in which the state and Central Catholic High School were related makes the challenged activity state action. Plaintiffs admit that *Powe*, *Browns*, and *Grossner* rejected this same argument but argue that these three cases misread the principal case upon which they all rely, *Burton*. This court is not convinced that these three cases

misread *Burton*—indeed, there is much support for their position in the language of *Burton*. *See* Burton v. Wilmington Parking Auth., *supra*, 365 U.S. at 722, 724, 725, 81 S.Ct. 856; Public Util. Comm. v. Pollack, *supra*, 343 U.S. at 461–462, 72 S.Ct. 813.

Accordingly, under the authority of the *Powe, Browns,* and *Grossner* decisions, this court holds that because the State of Indiana was in no way involved in the challenged actions, defendants' expulsion of plaintiffs · was not state action.

### C. *Not Sufficient State Involvement with Central Catholic High School in Ways Other Than Challenged Activity*

Even assuming arguendo that the *Powe, Browns,* and *Grossner* decisions were incorrect in limiting the state action inquiry primarily to the relationship of the state with the challenged activity, nevertheless, as an alternative ground for holding that defendant's actions did not constitute state action, the *other* relationships between the State of Indiana and Central Catholic High School were insufficient to make the expulsions of plaintiffs the actions of the State.

This court takes its guidance in this extensive form of state action analysis from the scholarly opinion of Judge Lord in Pennsylvania v. Brown (Girard College case), 270 F.Supp. 782 (E.D.Pa. 1967), aff'd, 392 F.2d 120 (3d Cir.1968) (five-judge panel), cert. denied, 391 U.S. 921, 88 S.Ct. 1811, 20 L.Ed.2d 657. Plaintiffs themselves cite Judge Lord's opinion, with approval, as properly performing the two-fold inquiry implied by *Evans:* First, the nature of the state involvement and, second, the nature of the institution involved.

 Judge Lord began his reasoning by noting that in the broadest sense "almost everything we do is in part the product of or is facilitated by *some* State action." *Id.,* 270 F.Supp. at 788 (emphasis added). Yet it is not enough

that there merely be "some" state involvement—there must be "significant" state involvement. *E. g.,* Reitman v. Mulkey, 387 U.S. 369, 380, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967). In order to ascertain if a state has become "significantly involved," the court must ascertain the purpose of the state action doctrine. Mr. Justice Cardozo noted· in The Nature of the Judicial Process (1921) the tendency of a legal principle to expand itself to the limits of its logic, but, as Chief Justice Burger aptly observed, "such expansion must always be contained by the historical frame of reference of the principle's purpose * * *." Walz v. Tax Comm., *supra,* 90 S.Ct. at 1416.

This court agrees with Judge Lord's statement of the purpose of the state action doctrine, as enunciated by the Supreme Court in *Evans* and *Burton:*

> "The purpose of [the ·state action] inquiry is to ascertain whether the institution (here, Girard College) is presently associated with the State in a manner which tends to suggest to the community that the institution's policy of racial discrimination is either practiced by or approved by public authority.
>
> ,* * * * *
>
> "The quest is not for a scintilla of State action, for State action is ubiquitous and persuasive. The inquiry is properly directed to the type of State action involved, the extent to which the State thereby associates itself with invidious discriminatory purposes and policies, and, accordingly, the extent to which responsibility for the perpetuation of those invidious designs may be justifiably ascribed to the State itself." Pennsylvania v. Brown, *supra,* 270 F.Supp. at 789.

With this purpose in mind, what is the nature of the State's involvement with Central Catholic High School?

#### 1. *Nature of State Involvement with Central Catholic High School*

 The detailed discussion in I B, *supra,* of the relationship of the State of

Indiana with Central Catholic High School may fairly be summarized as consisting of two elements: (1) general supervision of the quality of the education provided at Central Catholic High School and (2) the indirect financial assistance of exemption from property taxes. It should be noted here that Indiana has not singled out Central Catholic High School specifically, parochial schools generally, or even educational institutions as such for this tax exemption. Rather, it has granted this exemption to a broad class of organizations which may be generally described as nonprofit organizations, including hospitals, libraries, scientific, literary and educational groups. *See* Ind.Stat.Ann. § 64–201 (Burns' 1969 Supp.).

There can be no doubt that this supervision and tax exemption constitute action by the State, but the question is whether it constitutes the *"significant involvement"* of the State in the challenged activity so that these actions may be justifiably ascribed to the State itself. *See* Evans v. Newton, *supra*, 382 U.S. at 299, 86 S.Ct. 486; Burton v. Wilmington Parking Auth., *supra*, 365 U.S. at 725, 81 S.Ct. 856; Reitman v. Mulkey, *supra*, 387 U.S. at 380, 87 S.Ct. 1627; Adickes v. S. H. Kress & Co., *supra*, 398 U.S. at 169, 90 S.Ct. at 1614. This court concludes, as did Judge Lord (Pennsylvania v. Brown, *supra*, 270 F.Supp. at 790), that, standing alone, the supervision which Indiana exercises over education in private schools and the tax exemption which it gives generally to educational institutions do not so insinuate the State "into a position of interdependence with [Central Catholic High School] * * * that it must be recognized as a joint participant in the challenged activity * * *." Burton v. Wilmington Parking Auth., *supra* at 725, 81 S.Ct. at 862.

In arguing for the opposite conclusion, plaintiffs attach great significance to Mr. Justice Douglas's dicta in *Evans* that:

"If a testator wanted to leave a school or center for the use of one race only and in no way implicated the State in the supervision, control, or management of that facility, we assume *arguendo* that no constitutional difficulty would be encountered." Evans v. Newton, *supra*, 382 U.S. at 300, 86 S. Ct. at 489 (footnote omitted).

However read in its context, Justice Douglas' hypothetical supports this court's holding that there is no state action in this case. The above quote of Justice Douglas is immediately preceded by the following explanation of *Burton:*

"The range of governmental activities is broad and varied, and the fact that government has engaged in a particular activity does not necessarily mean that an individual entrepreneur or manager of the same kind of undertaking suffers the same constitutional inhibitions. While a State may not segregate public schools so as to exclude one or more religious groups, those sects may maintain their own parochial educational systems. Pierce v. Society of Sisters [*supra*] * * *." *Id.*

Justice Douglas' citation of *Pierce* is most significant because there the Supreme Court stated that there was no question that the state had the power reasonably "to regulate *all* schools, to inspect, supervise and examine them, their teachers, and pupils; to require that all children of proper age attend some school, * * * [and] that certain studies * * * be taught * * *." Pierce v. Society of Sisters, *supra*, 268 U.S. at 534, 45 S.Ct. at 573 (emphasis added); Meyer v. Nebraska, *supra*, 262 U.S. at 402, 43 S.Ct. 625. Consequently, in light of Justice Douglas' citation to *Pierce* immediately before his hypothetical concerning the testator, his dicta, quoted above, must be interpreted as if it read: "If the testator * * * in no way implicated the State [beyond its ordinary and usual extent] in the supervision, control, or management of that facility * * *." *See* Pennsylvania v.

Brown, *supra,* 270 F.Supp. at 789–791 and 392 F.2d 120.

The consequence of *not* reading Justice Douglas' hypothetical as qualified by *Pierce's* recognition of the states' power to reasonably supervise *all* education would be to effectively eliminate private education. If, as plaintiffs argue, the state need not be involved in the activity challenged and merely the state's normal supervision of all education, including private schools, and its granting of tax exemptions to a broad class of nonprofit organizations, including private schools, is sufficient to constitute state action, then not only must Central Catholic High School's disciplinary procedures conform to the requirements of the Fourteenth Amendment but it would also be subject to all other constitutional limitations applicable to public schools. As discussed in II B, *supra,* the constitutional limitations upon public schools include prohibitions upon religious observances, instruction and perspectives, limitations upon the school's control over the curriculum, expression of opinion, and appearance, and restrictions upon the school's methods of selecting and dismissing its faculty. Perforce of plaintiffs' contentions and the rationale of decision which they urge upon this court, *all* such constitutional restrictions would be binding upon Central Catholic High School.

Plaintiffs cite no persuasive authority, nor has the court found any, which would require or even justify a finding that the Fourteenth Amendment's restrictions upon state action are applicable to Central Catholic High School's disciplinary procedures. The court agrees with plaintiffs that Judge S. Wright's decision in Guillory v. Administrators of Tulane Univ., 203 F.Supp. 855 (E.D.La.), vacated, 207 F.Supp. 554 (E.D.La), aff'd, 306 F.2d 489 (5th Cir. 1962), is not helpful. Not only do plaintiffs fail to have any compelling judicial support for their contentions but they have invited this court to adopt a rationale of decision which would effectively eliminate private education. As dis-

cussed in II, *supra,* a decision which would encompass such a result raises questions of profound constitutional significance, since the right of parents to maintain and of children to attend private schools is among their fundamental personal liberties and enriches our highly valued tradition of social pluralism.

Lacking any clear guidance as to the appropriate resolution of the constitutional issues which would be raised by a finding of state action under this extensive form of state action inquiry, this court would be reluctant to find state action *if* this were a close case. However, as indicated earlier, this is *not* a close case; the relationship between Central Catholic High School and the State of Indiana falls far short of that which would be required to constitute "significant involvement" of the State. *See, e. g.,* Pennsylvania v. Brown, *supra. Cf.* Kadlec v. Illinois Bell Tel. Co., 407 F.2d 624, 627–629 (7th Cir.1969, reh. denied) (concurring opinion).

### 2. *Nature of Institution Involved*

Not only do plaintiffs fail to satisfy the first inquiry of *Evans*—the nature of state involvement—but they also fail to satisfy the second inquiry—the nature of the institution in terms of the services it performs in the community. In *Evans,* the Supreme Court concluded that a privately owned park which had been open to *every* white person and which had, because of its historical relationship with the City of Macon, Georgia, taken on the appearance of a public facility rendered a service "municipal in nature." Evans v. Newton, *supra,* 382 U.S. at 301, 86 S.Ct. 486. Yet the Court specifically excluded "schools such as Tuskegee" from its examples of institutions which traditionally serve the community. *Id.* at 302, 86 S.Ct. 486. Moreover, the Court recognized that the fact the government engages in a particular activity (here, education) does not *ipso facto* make that activity a public function. *Id.* at 300, 86 S.Ct. 486 (quoted above in III C 2).

Central Catholic High School does not give the appearance, as did the park in *Evans,* of being a public facility or public school. Unlike public schools, attendance at Central Catholic High School is conditioned upon the payment of tuition. Unlike public schools, Central Catholic High School consciously maintains a specific religious (Roman Catholic) atmosphere. While Central Catholic High School does not explicitly exclude any child who can pay the tuition, its atmosphere and commonly known purposes have the effect of attracting almost exclusively (98 per cent) Roman Catholic pupils. In short, there is nothing in the operations or public image of Central Catholic High School which would suggest that its disciplinary practices were approved by the State, much less that the State was a "joint participant" in them. *See* Evans v. Newton, *supra* at 301–302, 86 S.Ct. 486. Burton v. Wilmington Parking Auth., *supra,* 365 U.S. at 723–725, 81 S. Ct. 856; Pennsylvania v. Brown, *supra,* 270 F.Supp. at 791–792.

To support their argument that Central Catholic High school does perform a public function within the meaning of *Evans,* plaintiffs rely principally upon Article 8, Section 1, of the Indiana Constitution:

> *"Common Schools.*—Knowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government; it shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement; and to provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all."

What this common provision in state constitutions expresses is the general interests of the states in promoting an educated citizenry. Toward this end, the legislature is mandated generally to advance knowledge and specifically to provide tuition-free public (common) schools open to all who choose to attend them.

Thus, *public* education is a state function. *See, e. g.,* School City of Terre Haute v. Harrison Sch. Township, 184 Ind. 742, 745, 112 N.E. 514, 516 (1916). Yet the fact that the State provides tuition-free schools in order to promote an educated citizenry does not mean that *all private* educational institutions perform a "public function," as that term is used in *Evans. See* Powe v. Miles, *supra,* 407 F.2d at 79–80; Grossner v. Trustees of Columbia Univ., *supra,* 287 F.Supp. at 549; Pennsylvania v. Brown, *supra,* 270 F.Supp. at 791–792. To conclude otherwise would have the effect of eliminating private education.

### ORDER

For the reasons discussed above, defendants' motion to dismiss plaintiffs' complaint, as amended, for failure to state a cause of action is granted because Central Catholic High School's expulsion of the plaintiffs did not constitute "state action" within the meaning of the Fourteenth Amendment. Accordingly, plaintiffs' motion for a preliminary injunction is denied in its entirety.